IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CERON HILL,<br><br>               Petitioner,<br><br>       vs.<br><br>CHRISTIAN PFEIFFER, Acting Warden,<br>Kern Valley State Prison,[1]<br><br>               Respondent. | No. 2:12-cv-02098-JKS<br><br>ORDER<br>[Re: Motion at Docket No. 55]<br>and<br>MEMORANDUM DECISION |

Ceron Hill, a state prisoner represented by counsel, filed a Petition for a Writ of Habeas

Corpus with this Court pursuant to 28 U.S.C. § 2254.  Hill is in the custody of the California

Department of Corrections and incarcerated at Kern Valley State Prison.  Respondent has

answered, and Hill has replied.

I.  BACKGROUND/PRIOR PROCEEDINGS

On March 11, 2009, Hill was charged with the murder of Jack Lawrence.  The

information also alleged that, in the commission of the charged offense, Hill personally and

intentionally discharged a firearm, which proximately caused great bodily injury and death to

Lawrence within the meaning of California Penal Code § 12022.53(d).  The information further

alleged that Hill had committed the charged offense while released from custody on a primary

offense,[2] before the judgment on that offense had become final, within the meaning of Penal

---

[1]       Christian Pfeiffer is substituted for Martin D. Biter as Acting Warden, Kern Valley State Prison.  FED. R. CIV. P. 25(d).

[2]       The instant Petition challenges Hill's conviction rendered on July 31, 2009, in case number 06F02697.  A case law search indicates that Hill was also convicted in a separate case, No. 05F07866, of armed robbery committed on September 7, 2005, which was the primary offense referred to in the indictment against Hill in the instant case.  *See People v. Hill*, No.

Code § 12022.1.  On direct appeal of his conviction, the Court of Appeal recounted the following

facts underlying the charges against Hill:

**A**

***The Prosecution***

On the morning of March 15, 2006, Lawrence visited his friend Stanley Edwards
at Edwards's apartment on Mack Road.  Edwards was in the process of waking up, so
Lawrence went across the street to the donut shop.  Edwards was planning on joining
Lawrence 15 minutes later.

The donut shop was located on Mack Road in a strip mall.  Also in the strip mall
was a Metro phone store.  Going to the phone store that morning was one of Lawrence's
childhood friends, Christopher Stone (Chris).[1]  On his way to the store, Chris saw a white
car that was traveling slowly past the donut shop and making multiple U-turns.
Defendant, who was known as "Dooty," was a passenger in the car.

> FN1.   Chris Stone has a brother, Donald Stone, who was also involved in this
> case.  We will therefore refer to the brothers by their first names.

At the strip mall, Chris, who was sometimes mistaken for his brother Donald, saw
Lawrence walking to the donut shop.  The two started talking.  Lawrence told Chris, "'Be
cool.  Doo[ty] out here .'"

Lawrence, Chris, and Donald were all affiliated with a gang called Bad Ass
Youngsters or BAY.  [Hill] was not.  Three weeks prior, [Hill] had approached Donald at
a Chevron station and said he had heard that Donald and his partner "Poppa" were the
ones who had shot at [Hill] in an earlier incident.  [Hill] then pulled out a gun and started
shooting in the air.  Since then, according to Chris, [Hill] had "been trying to get all
[Chris's] partners from [BAY]."

Chris told Lawrence that he needed to go to the Metro store and would be right
back.  Chris saw the car again, driving "hella slower."

Chris finished his business at the Metro store, and as he was walking back to the
donut shop, he heard three gun shots.  Chris and Lawrence ran.  Chris looked back and
saw the shooter's profile.  The shooter was [Hill].

Lawrence collapsed as he was running.  Chris ran to him and saw that Lawrence
had been shot in the chest.  Chris told Edwards, who had come to the scene from his
apartment, "'Dooty did it.'"  Chris heard another four gunshots and saw [Hill]
"[b]ounce[]" in the white car.  Lawrence died that day.

Chris and Edwards were interviewed by police.  Edwards told police that when he
had asked Chris who shot Lawrence, Chris told him, "'Dooty did it.'"  When Chris was

05F07866, 2011 WL 856423 (Cal. Ct. App. Mar. 11, 2011).

interviewed, he initially told Detective Scott MacLafferty he did not know who did it and he had told Edwards, "some dude shot [Lawrence]." As the interview progressed, Chris admitted to MacLafferty he had seen the white car with [Hill] inside and [Hill] shot Lawrence. At trial, Chris testified he did not personally know Dooty, and he implicated Dooty in the interview so the police would let him (Chris) go.

On March 22, 2006, [Hill] was arrested. He had another man's identification card on him. A search of [Hill's] bedroom revealed three bags containing shoes and clothes stacked by the bedroom door "like they were getting ready for someone to leave."

The next day Detective MacLafferty interviewed one of [Hill's] girlfriends, Lashawna Dees. She told MacLafferty [Hill] had told her "'something bad happened in Sacramento'" and he was going to Atlanta. Dees told her best friend, Stashaun Lewis, [Hill] wanted to leave town because he had shot someone. For Lewis's safety, the district attorney's office relocated her. The relocation expenses totaled approximately $27,000, all of which, except for $1,695 in per diem expenses, was paid directly to the service providers.

## B

### The Defense

Jennifer Carroll, who had lived in the Mack Road area for 27 years, saw the shooting. After she learned that Lawrence died, she contacted police. She was shown a photographic lineup of suspects that included [Hill], but she did not identify any of them as the shooter. At trial, she remained "confident" that [Hill] was not the shooter.

*People v. Hill*, No. C063103, 2011 WL 341124, *1-2 (Cal. Ct. App. Feb. 4, 2011).

On March 10, 2009, Hill proceeded to jury trial. Outside the presence of the jury, Hill admitted the Penal Code § 12022.1 allegation by acknowledging that he had been released from custody on a primary offense on the date that the charged offense was committed.

At the conclusion of trial on April 1, 2009, the jury found Hill guilty of first-degree murder and found true the allegation that he had personally and intentionally discharged a firearm. After the verdict, Hill retained new counsel. Counsel moved for a new trial after the verdict based in part on possible juror misconduct. The motion was denied. On the same day that the trial court denied his motion for a new trial, the court sentenced Hill to an indeterminate term of 25 years to life imprisonment for murder and a consecutive term of 25 years to life

imprisonment for the firearm enhancement.  Hill was additionally sentenced to a consecutive determinate term of 2 years for the Penal Code § 12022.1 enhancement, and re-sentenced on the armed robbery conviction in Case No. 05F07866 to an aggregate term of 13 years' imprisonment.

Through counsel, Hill appealed his conviction, arguing that: 1) he was deprived of a fair trial when the trial court admitted into evidence coerced and involuntary statements made by Chris Stone to law enforcement; 2) the trial court made six errors with respect to instructing the jury about evidence of prior statements; 3) the judgment should be reversed because the trial court did not adequately investigate an occurrence of jury tampering and juror misconduct; 4) the prosecutor committed misconduct during summation; and 5) his conviction was not supported by legally sufficient evidence.  On February 4, 2011, the Court of Appeal issued a reasoned, unpublished opinion affirming Hill's judgment in all respects.  *Hill*, 2011 WL 341124, at *11. Counsel petitioned the Court of Appeal for rehearing on Hill's jury tampering and juror misconduct claim on the ground that the appellate opinion misstated facts material to the resolution of the issue.  Rehearing was summarily denied on February 25, 2011.  Hill then filed a counseled petition for review in the California Supreme Court, raising all claims he had unsuccessfully raised before the Court of Appeal.  The Supreme Court denied the petition without comment on May 11, 2011.

Hill then retained different counsel who filed a petition for a writ of habeas corpus in the California Supreme Court.  The state habeas petition again raised Hill's claims that his conviction was impermissibly based on coerced statements from Chris Stone, the trial court misinstructed the jury as to evidence of prior statements, the trial court failed to adequately

explore allegations of jury tampering and misconduct, and the prosecutor committed misconduct. He likewise alleged that, to the extent any of those claims were forfeited, his trial counsel was ineffective for failing to preserve them.  Hill also argued for the first time in the habeas petition that he was denied effective assistance during plea negotiations.  The Supreme Court summarily denied the habeas petition on October 24, 2012.

Again proceeding through new counsel, Hill filed a counseled Petition for a Writ of Habeas Corpus to this Court, which was docketed on August 10, 2012.  Respondent moved to dismiss the Petition on the ground that Hill's conviction became final on August 9, 2011, and thus Hill had until August 9, 2012, to file his counseled Petition under the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1)(A).  Docket No. 18 at 3.  A magistrate judge previously assigned to this case concluded that Hill timely filed the Petition on August 9, 2012, when his counsel entered the filing into the Court's electronic case filing system, even though the credit card payment for the $5.00 filing fee was not made until the following day, and recommended that the motion to dismiss be denied.  Docket No. 34 at 4.  A previously-assigned judge adopted the magistrate judge's findings and recommendations and ordered Respondent to answer the Petition.  Docket No. 36 at 2.  The briefing in this case is now complete and before the undersigned judge for consideration.

At Docket No. 55, Hill moves to expand the record to include his declaration bearing on his ineffective assistance of plea counsel claim.  Respondent opposes the motion.  Briefing on that motion is also now complete, and the pending motion is also ripe for adjudication.

## II. GROUNDS/CLAIMS

In his counseled Petition before this Court, Hill argues: 1) he was denied due process and a fair trial when the trial court admitted coerced statements Chris Stone made to law enforcement; 2) to the extent the first claim is procedurally barred, counsel was ineffective for failing to preserve the claim; 3) the trial court erred in *sua sponte* failing to instruct the jury to disregard Chris's statements as involuntary; 4) trial counsel was ineffective for not requesting an instruction that the jury should disregard Chris's statements as involuntary; 5) the jury was erroneously instructed with respect to CALCRIM 318; 6) the judgment should be reversed due to the trial court's failure to explore allegations of juror misconduct; 7) Hill was denied effective assistance of counsel during plea negotiations; 8) the prosecutor committed misconduct during summation; and 9) Hill's conviction was not supported by legally sufficient evidence.  Hill further requests an evidentiary hearing as to all his claims "[t]o the extent that the factual averments in [the Petition] are contested or disputed."

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

6

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's

findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.      Procedural Bar

Respondent urges this Court to dismiss the claims raised in Grounds 1 and 8 as procedurally barred because the Court of Appeal rejected them on the ground that trial counsel failed to object at trial.  Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial.  *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).

In his Traverse, Hill contends that the claims are not barred from federal review because he has established good cause.  "Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner."  *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  "In order to constitute adequate and independent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default."  *Morales v. Calderon*, 85 F.3d 1387, 1393 (9th Cir.

8

1996) (citation omitted).  If a petitioner has procedurally defaulted on a claim, a federal court

may nonetheless consider the claim if the petitioner shows: 1) good cause for his failure to raise

the claim at trial; and 2) prejudice from the purported constitutional violation; or 3) demonstrates

that not hearing the claim would result in a "fundamental miscarriage of justice."  *Coleman*, 501

U.S. at 749-50; *Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992).

Here, Hill avers that good cause is shown because the claims were forfeited due to the

ineffective assistance of counsel.  But given that the claims may be more easily resolved on the

merits, the Court declines to decide whether good cause was established and instead reaches

their merits, as discussed below.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (in the

interest of judicial economy, the court may address a petition's merits without reaching

procedural issues); *Van Buskirk v. Baldwin*, 265 F.3d 1080, 1083 (9th Cir. 2001) (declining "to

reach the complex questions lurking in the time bar of the AEDPA" where the district court

"decided the case on the merits, and on the merits it was right as a matter of law").

B.     Merits

1.     *Testimony of Chris Stone* (Grounds 1 through 4)

Hill first brings a number of claims directed to the testimony and pre-trial statements of

Chris Stone.

On the day of the murder, Detective MacLafferty interviewed Chris in a police station

interview room, the contents of which were recorded.  Chris stated that he had seen the victim

Jack Lawrence at the shopping center as Chris was walking to the Metro store to charge his

phone.  After he left the Metro store, Chris heard gunshots and saw Lawrence run; Chris also

ran.  Lawrence fell to the ground, and Chris ran first to his friend Stanley Edwards and then back

to Lawrence.  Initially, Chris denied that he knew the identity of the shooter; he said only that he

saw someone wearing a navy blue or gray pea coat and gray jeans.

While Chris was being interviewed, Edwards was being interviewed by another detective

in a different room.  Edwards said that he saw a man shoot towards Lawrence and Chris, after

which Chris ran up to him and asked to use his phone.  Edwards asked Chris what had happened,

and Chris responded, "Dooty, Dooty did it."

After a break, Detective MacLafferty asked Chris, "Who's Dooty?"  Chris repeatedly

denied knowing him and denied that he had told Edwards that Dooty was the shooter.

The detectives then brought Edwards into the interview room with Chris.  Eventually, the

detectives left Edwards and Chris alone in the interview room for two periods of time.  During

the second period, Chris told Edwards, "I'm not a snitch.  I'm not a snitch on nobody, man."  He

then said, "Dooty shot us.  Feel me?"  But he then stated, "I'm just not gonna tell him who did it,

though."

After Edwards was taken from the room, Detective MacLafferty again urged Chris to tell

him everything he knew about Hill.  At that point, Chris admitted that he had heard of Dooty.

He further told the detective that, when he first saw Lawrence that day, Lawrence had told him

that Chris's brother Donald had told him to "'watch out 'cause Dooty out there.'"  After

continued questioning, Chris admitted that he had seen Hill on a few occasions and knew what

he looked like.  He further admitted that he knew Hill had disagreements with about five BAY

members and that was why Lawrence had mentioned that Hill was around that day.  Chris also

described a white Dodge Intrepid making U-turns that he saw before encountering Lawrence in

the shopping center.  According to Chris, an African-American man wearing a pea coat and red

hooded sweatshirt was a passenger in the car, and Chris thought he was Hill.  After Chris spoke

with Lawrence, he saw the white Intrepid driving around slowly.  After additional

encouragement, Chris told Detective MacLafferty that he had seen the shooter's profile and

noticed that he was wearing a gray pea coat with a red hooded sweatshirt underneath and gray

jeans; according to Chris, the shooter was Hill.

At trial, Chris was called as a prosecution witness.  He was a very reluctant witness and

denied at trial that he had seen the shooter.  He further testified that he did not know who Dooty

was, although he had heard of him.  He also denied that he had told Edwards, either at the scene

or in the interview room, that Hill was the shooter.  He testified that he used someone's phone

and told that person that "some dude just shot my partner."  He further testified that he never told

anyone that Dooty shot Lawrence.

When asked about the interview, Chris said that the officer had told him that he could not

go home until he agreed to what the officer wanted him to say so he "just started making stuff

up."  Chris also indicated that the portion of the interview in which the officer told him that he

could not go home had not been recorded.  He testified that he did not remember telling Edwards

that "Dooty shot us" when they were alone in the interview room and that he had told the

detective that Dooty was a passenger in the white Intrepid only because he wanted to go home.

a.      Admission of coerced statements

Hill first argues that his rights to due process and a fair trial were violated by the court's

admission of Chris's pre-trial statements to law enforcement, which he contends were coerced

and illegally obtained.

In *Payne*, the United States Supreme Court declared that a petitioner's coerced confession could not be used before a jury over the petitioner's objection because it violated the petitioner's constitutional rights.  *Payne v. Arkansas*, 356 U.S. 560, 567 (1958).  In *Jackson*, the Court found that a conviction based on a defendant's involuntary confession, "without regard for the truth or falsity of the confession," deprived the defendant of his Fourteenth Amendment rights.  *Jackson v. Denno*, 378 U.S. 368, 376 (1964).  The Supreme Court later explained that its decision in *Jackson* was "designed to safeguard the right of an individual . . . not to be compelled to condemn himself by his own utterances."  *Lego v. Twomey*, 404 U.S. 477, 485 (1972).  Likewise the use of a defendant's coerced confession to a psychiatrist, who was the paid representative of the state at the time of the confession, was found to violate the defendant's due process rights.  *Leyra v. Denno*, 347 U.S. 556, 559-561 (1954).

The Supreme Court has thus clearly established that a defendant's coerced testimony cannot be used against him at trial.  However, no Supreme Court authority addresses the issue of whether coerced witness testimony can be used against a defendant at trial.  In all the cases cited above, the defendants argued that their confession to a crime had been coerced by state actors. Here, Hill is arguing that statements made by a witness, implicating him in a murder, were coerced.  It is not clearly obvious that the rules established in the cases above would apply to Hill's claim, which is distinct from those cases concerned with a defendant being forced to condemn himself.  Because no Supreme Court case addresses the specific question presented, there is no clearly established federal law that the state court decision could be contrary to or an unreasonable application of.  *See Carey*, 549 U.S. at 77.

Regardless, even if Hill could show that he has a clearly established right to challenge the admission at trial of the coerced statements of a third party witness, habeas relief would nevertheless be unwarranted here because the state court reasonably concluded that Chris's statements to police were not the result of police coercion.  As the Court of Appeal found:

> The circumstances of the interview were not coercive.  For example, during the police interview, Chris asked for and was given bathroom breaks, water, and food.  He was not questioned continuously by police, as they had to interview other people, work on the computers, and follow up on other leads.
> The substance of the interview was not coercive.  As Detective MacLafferty explained, the first part of the interview focused on what had transpired and the second part consisted of the police "slowly introduc[ing] bits and pieces of evidence to . . . corroborate and rule in or rule out whether somebody [wa]s telling [them] the truth or not."
> Finally, nothing about Chris's circumstances demonstrated he was particularly vulnerable to coercion.  He was 18 years old when interviewed.  He was familiar with law enforcement, as he had been in the juvenile or criminal justice system since age 15.  And he did not exhibit signs of intoxication during the interview.

*Hill*, 2011 WL 341124, at *3 n.2.

Moreover, it is worth noting that Chris was subjected to extensive cross-examination regarding his pre-trial statements to police.  During that cross-examination, Chris extensively testified that he felt pressured by the police during the interview and that he implicated Hill as a result of that pressure.  Thus, the jury had all the information it needed to determine if Chris had been truthful to police or whether he had merely implicated Hill out of fear.  Consequently, even assuming error, the introduction into evidence of Chris's pre-trial statements to police could not have rendered Hill's trial fundamentally unfair.  *See Williams v. Woodford*, 384 F.3d 567, 596 (9th Cir. 2002) (finding no evidence that petitioner's right to fair trial was violated where witness who was beaten at city jail was available for cross-examination about coercion, therefore allowing petitioner "to test the voluntariness and veracity" of witness's testimony at trial);

*United States v. Mattison*, 437 F.2d 84, 85 (9th Cir. 1970) (no violation of due process where witness, previously interrogated illegally, was subject to cross-examination at trial through which jury could assess witness's credibility).  Hill is therefore not entitled to relief on this claim.

> b.   Ineffective assistance of counsel

Hill also argues that both trial and appellate counsel were ineffective for failing to challenge the admission of Chris's pre-trial statements.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86; *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that

determination was unreasonable-a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Hill must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Hill fails to satisfy this heavy burden with respect to either his trial or appellate counsel. As noted above, the Court of Appeal found the statements admissible under California law. Moreover, as previously discussed, Hill has not identified, and the Court is not aware of, any Supreme Court precedent regarding the inadmissibility at trial of an allegedly coerced witness pre-trial statement. Because the Court of Appeal's admissibility determination was reasonable, and there is no Supreme Court precedent finding such evidence to be inadmissable and no Supreme Court precedent finding that the failure of counsel to object to such evidence to be constitutionally ineffective, Hill has not shown that the decision of the California Court of Appeal was either contrary to or an unreasonable application of clearly established federal law. *See Carey*, 549 U.S. at 77.

Indeed, contrary to Hill's assertions, the record reflects that trial counsel's method of handling Chris's prior statement was a reasonable trial tactic. *See Strickland*, 466 U.S. at 689. At trial, counsel argued that playing the prosecution's chosen excerpts of the interview would deprive the jury of necessary context, and he successfully persuaded the court to play the entire interview for the jury. By playing the interview in its entirety, counsel was able to show to the jury the way the detective elicited the comments, which the defense contended was coercive. Trial counsel then effectively cross-examined Chris, through which he testified that he had lied during the interview in order go home. These arguments and statements, if accepted and believed, would have allowed the jury to conclude that Chris was manipulated into making the statements incriminating Hill.

Accordingly, Hill cannot prevail on these ineffective assistance of counsel claims.

        c.      Instructional error

Hill further contends that the jury should have been instructed to either disregard or view with caution Chris's statements to Detective MacLafferty. Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a desired jury instruction was not warranted under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

16

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting

conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72.  Moreover, even if

the trial court's failure to give the instruction violated due process, habeas relief would still not

be available unless the error had a "substantial and injurious effect or influence in determining

the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519

U.S. 2, 5 (1996).

Hill first contends that the trial court had a *sua sponte* duty to instruct the jury regarding

the defense theory that Chris's pre-trial statements were coerced.  The Court of Appeal rejected

the claim because the "factual premise on which it is based is not true." *Hill*, 2011 WL 341124,

at *4.

Under the Due Process Clause of the Fourteenth Amendment and the Compulsory

Process Clause and Confrontation Clause of the Sixth Amendment, criminal defendants must be

afforded a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S.

683, 690 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984).  The Supreme Court has not

recognized a generalized constitutional right to have a jury instructed on a defense available

under the evidence under state law. *See Gilmore v. Taylor*, 108 U.S. 333, 343 (1993).  However,

when habeas relief is sought under 28 U.S.C. § 2254, a failure to instruct on the defense theory

of the case constitutes error if the theory is legally sound and evidence in the case makes it

applicable. *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006); *see Mathews v. United States*,

485 U.S. 58, 63 (1988) (reversing a conviction and holding that even if a defendant denies one or

more elements of the crime, he is entitled to an entrapment instruction whenever there is

sufficient evidence from which a reasonable jury could find entrapment, and the defendant

requests such an instruction).  The Supreme Court has held that harmless error analysis applies to

instructional errors as long as the error at issue does not categorically vitiate all the jury's

findings.  *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (citing *Neder v. United States*, 527 U.S. 1,

11 (1999)).

This Court is bound by the state court's application of state law and its conclusion that

the theory of coercion was not legally sound under the circumstances, which as discussed above,

was both reasonable and fully supported by the record.  Moreover, a failure to instruct on a

defense theory has been held harmless under the *Brecht* standard where other instructions

permitted consideration of the pertinent defensive matter.  *Beardslee v. Woodford*, 358 F.3d 560,

576 (9th Cir. 2004) (failure to instruct on manslaughter was not error, but if it was error, it was

harmless error because it had no substantial or injurious effect or influence in determining the

jury's verdict in light of the verdicts rendered and the giving of numerous instructions that

permitted consideration of the matter in question).  In this case, as discussed below, the jury was

charged with CALCRIM No. 318 regarding a prior inconsistent statement, which allows the jury

to decide for itself whether the witness's in-court testimony or the prior statement is true.  The

jury was also instructed that it must "judge the credibility or believability of the witnesses," and

that, in so doing, "you may consider anything that reasonably tends to prove or disprove the truth

or accuracy of that testimony."  The jury was likewise instructed on factors to consider in

evaluating witness credibility and specifically told not to reject trial testimony "just because of

inconsistencies or conflicts."  Hill is thus not entitled to relief based on the trial court's failure to

*sua sponte* offer such pinpoint instruct.

And because Hill cannot show that a pinpoint instruction was required or indeed even

warranted, Hill cannot show that trial counsel was ineffective for not requesting one.  Moreover,

Hill fails to show prejudice—it does not appear reasonably believable in light of the other

instructions given that the outcome would have been different had the jury been given the now

offered pinpoint instruction.  Hill is thus not entitled to relief on this claim.

> 2.      *Flawed California Pattern Instruction* (Ground 5)

In a related claim, Hill challenges California's pattern instruction on evidence of a

witness's prior statements.  The Court of Appeal rejected this claim on direct appeal as follows:

> [Hill] contends CALCRIM No. 318, which was given here, was an erroneous
> statement of law, was "no substitute" for its predecessor (CALJIC No. 2.133) and caused
> "incalculable harm."
> CALCRIM No. 318 as given here stated as follows:
> "You've heard evidence of statements that a witness made before trial.
> "If you decide that the witness made those statements, you may use those
> statements in two ways:
>> "1. To evaluate whether the witness's testimony in court is believable; and
>> 2. As evidence that the information in those earlier statements is true."
> [Hill] argues this instruction was defective in three ways. We take each in turn.
> One, [Hill] argues CALCRIM No. 318 improperly allowed use of all prior
> statements by witnesses for the truth of the matter by not distinguishing between prior
> statements that were consistent or inconsistent with the witness's testimony (and
> therefore admissible as substantive evidence) and prior statements that were neither
> consistent nor inconsistent with the witness's testimony (and therefore inadmissible as
> substantive evidence).  This argument was rejected in *People v. Solórzano* (2007) 153
> Cal. App. 4th 1026 1038-1039: "[the] argument betrays an incorrect reading of CALJIC
> No. 2.13, which straightforwardly allow[ed] the jury to use prior statements as
> substantive evidence without finding those statements inconsistent with his or her
> testimony (as does CALCRIM No. 318) and which optionally characterize[d] as
> inconsistent a witness's testimony that he or she 'no longer remember[ed] a certain
> event' if the jury disbelieve[ed] that testimony."
> Second, [Hill] argues the instruction "improperly allow[ed] a third party statement
> reported by a witness to be used as substantive evidence even if the statement f[e]ll[ ]
> within no exception to the hearsay rule."  [Hill] misconstrues the instruction by assuming
> it applies to a hearsay declarant other than the witness.  Such a construction is not
> consistent with the express language of the instruction.  CALCRIM No. 318 permits the
> jury to use statements made by the "witness" before trial "[a]s evidence that the
> information in those earlier statements is true."  The instruction does not allow the jury to
> use the witness's statements as evidence that what a third party declarant said was true.
> Third, [Hill] argues CALCRIM No. 318 did not tell the jury a witness is a person
> who testifies under oath and who sees, hears, or otherwise witnesses events.  Thus, [Hill]

argues, the jury may have regarded Lawrence as a witness and may have improperly used Chris's extrajudicial statements about what Lawrence said as evidence of what really happened.  Considering the instructions as a whole, as we must do (*People v. Frye* (1998) 18 Cal.4th 894, 958), the jury here would not have understood this to be the case.  The jury was instructed "[e]vidence is the sworn testimony of witnesses" and in evaluating a witness's testimony, it may consider factors such as "the witness's behavior while testifying."  As Lawrence did not testify, the jury would have understood he was not a witness.

*Hill*, 2011 WL 341124, at *4-5.

Again, the thrust of Hill's instructional error claim is that the instruction was incorrect under state law, a claim that is not cognizable in federal habeas corpus proceedings.  *Estelle*, 502 U.S. at 71-72.  Hill nonetheless argues that the instruction was contrary to the United Supreme Court's decision in *California v. Green*, 399 U.S. 149, 165-168 (1970), which, as Hill recognizes, allows jurors to consider for their truth prior inconsistent statements made by testifying witnesses.  According to Hill, "CALCRIM 318 allows jurors to consider utterances of people who never appear to testify so long as their words are mouthed, somewhere and sometime in the past, by a witness who does."

But on its face, the instruction applies only to statements made by the witness and not the hearsay declarant.  The instruction allowed the jury to use Chris's statements to the police as evidence of what he in fact told the police.  Contrary to Hill's assertion, the instruction did not allow the jury to use Chris's statements as evidence that what any hearsay declarant said was true, but only that Chris's account of what he said was true.  Accordingly, the Court of Appeal did not unreasonably apply controlling Supreme Court precedent in holding that no reasonable juror could have construed the language of CALCRIM No. 318 in the matter Hill suggests.  Therefore, Hill is not entitled to relief on this claim.

3.      *Jury Tampering* (Ground 6)

Hill also alleges that his conviction should be reversed due to jury tampering and juror

misconduct.  The Court of Appeal described the following background to this claim:

> Defense counsel filed a motion for new trial after the verdict based in part on possible juror misconduct.  To support the allegation of possible misconduct, defense counsel attached a summary of an interview of the juror conducted by a defense investigator.
>
> The summary stated in relevant part as follows: About the second or third day of trial, some male and female friends of defendant were "talking [g]ibberish in the elevator."  They said they "should beat [the juror's] ass."  When the juror got out of the elevator to go to her car, [Hill's] friends followed her.  "The woman said what a fake ass bitch [the juror] was and that [the juror] had fake boobs.  They said they should jump [the juror] in the elevator."  The juror "wasn't really concerned" but she "eventually told one of the other jurors and [they] brought it up to the bailiff."  The bailiff told the visiting judge.  After the verdict, the two jurors were escorted directly to their cars "so [they] didn't have to go past the people."  "None of the girls [who] made the comments testified in the trial."  "The comments did not affect [the juror's] decision making and [she] was not intimidated by it."
>
> During the hearing on the motion for new trial, defense counsel explained the juror had yet to sign a declaration attesting to these facts.  Defense counsel noted he had been retained on the case after the juror's statement had been taken and noted he was "bereft of a declaration from [the juror]."  He "kind of tried valiantly to save this, but it really [was]n't salvageable because you have to get a declaration from a juror."
>
> The court asked the bailiff for his recollection.  The bailiff stated the juror told him about an incident when she was on the lunch break and "people from the audience" who were in the elevator with her were "mumbling things . . . they wouldn't think that she would understand . . . but she thought that she understood what they were mumbling."  "[S]he stated it had nothing to do with the case.  She just said they were mumbling and she didn't feel threatened by it.  That's why she didn't bring it up at that time."  She did not include anything about being followed out to the parking lot.
>
> Defense counsel "indicate[d]" "this can be raised on habeas corpus" and said he "would withdraw the claim if the Court d[id]n't want to pursue it further, because [he] d[id]n't think [they] ha[d] evidence frankly one way or another [on] what fully happened."
>
> The court stated it was going "to put this to the end," noting it was "not necessarily something that should be left later on a habeas brief."  The court then stated "right now we have an insufficient record to make a ruling," and defense counsel "totally agree[d]" and acknowledged he might be "inviting error."

*Hill*, 2011 WL 341124, at *8.

The Court of Appeal subsequently rejected the claim:

[Hill] contends he is entitled to a reversal or at least an evidentiary hearing based on jury tampering and juror misconduct in delaying reporting the tampering. Further, he claims that because the court took no action and made no inquiry when the tampering and misconduct was disclosed, the presumption of prejudice that arose from the tampering and misconduct was never rebutted.

"'[W]hen the alleged misconduct involves an unauthorized communication with or by a juror, the presumption [of prejudice] does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant.'" Here, [Hill's] friends were "talking [g]ibberish" about "beat[ing] [the juror's] ass," and "jump[ing] [the juror] in the elevator," and making derogatory comments about the juror's appearance. These comments had nothing to do with [Hill's] guilt or innocence, so there was no presumption of prejudice entitling [Hill] to a reversal.

Moreover, where the alleged tampering is by the defendant's friends, our Supreme Court has "question[ed] whether a convicted person can ever overturn the verdict on grounds that persons acting in his behalf deliberately sought to influence the jury . . .. But even where, as here, there is no evidence petitioner was directly involved, recognition of such a claim suggests tempting opportunities for accuseds' allies to manufacture challenges against subsequent convictions." To the extent [Hill's] claim is that his friends were engaged in jury tampering, he cannot seek to benefit by a reversal or new trial based on their behavior.

Nor is there anything to support [Hill's] claim that the juror's failure to immediately report the incident constituted misconduct. "A sitting juror commits misconduct by violating her oath, or by failing to follow the instructions and admonitions given by the trial court. A lay juror cannot be expected to conform to standards of behavior of which she has not been informed, or to make unguided personal judgments about what the court needs to know. Her failure to do so cannot place at risk a presumptively valid verdict." [Hill] notes the jurors were admonished at the beginning of trial "[i]f you receive any information about this case from any source outside the trial . . . do not share that information with any other juror" and "if anyone tries to influence you, you must immediately tell the bailiff." He contends the juror here committed misconduct by talking about the incident with another juror and not reporting the incident immediately to the bailiff. The juror did not engage in misconduct because she reasonably could view the behavior by [Hill's] friends as simply harassing and not an attempt to influence her. She therefore could have believed she had no reason to immediately tell the bailiff. Furthermore, since [Hill's] friends did not convey any information about the case to her, she was not violating the court's instruction by telling a fellow juror what had happened.

Finally, the court did not abuse its discretion in failing to hold a further evidentiary hearing on the claims of jury tampering and juror misconduct. The only evidence the defense proffered on these issues was an investigator's report recounting the investigator's conversation with the juror. "'Normally, hearsay is not sufficient to trigger

the court's duty to make further inquiries into a claim of juror misconduct.'"  And, as we
have already explained, the evidence in the investigator's report did not "demonstrat[e] a
strong possibility that prejudicial misconduct [or tampering] had occurred."

On this record, there was no error, constitutional or otherwise, pertaining to
[Hill's] allegations of jury tampering and juror misconduct.

*Id.* at *8-10 (citations omitted).

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair

trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Due

process requires that the defendant be tried by "a jury capable and willing to decide the case

solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Bayramoglu v.*

*Estelle*, 806 F.2d 880, 887 (9th Cir. 1986) ("Jurors have a duty to consider only the evidence

which is presented to them in open court.").  A defendant is denied the right to an impartial jury

if even one juror is biased or prejudiced.  *Fields v. Woodford*, 309 F.3d 1095, 1103 (9th Cir.),

amended, 315 F.3d 1062 (9th Cir. 2002); *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998)

(en banc).

The introduction of prejudicial extraneous influences into the jury room constitutes

misconduct which may result in the reversal of a conviction.  *Parker v. Gladden*, 385 U.S. 363,

364-65 (1966).  "In the constitutional sense, trial by jury in a criminal case necessarily implies at

the very least that the 'evidence developed' against a defendant shall come from the witness

stand in a public courtroom where there is full judicial protection of the defendant's right of

confrontation, of cross-examination, and of counsel." *Turner v. Louisiana,* 379 U.S. 466, 472-73

(1965); *see also Estrada v. Scribner,* 512 F.3d 1227, 1238 (9th Cir. 2008) ("The Sixth

Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence

produced at trial." (citing *Jeffries v. Wood,* 114 F.3d 1484, 1490 (9th Cir. 1997) (en banc),

*overruled on other grounds by Gonzalez v. Arizona,* 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en

banc))).  Thus, the Ninth Circuit has "consistently recognized that the Sixth Amendment

prohibits jurors from introducing matters into the deliberations not present during the trial."

*Fields v. Brown*, 503 F.3d 755, 793 (9th Cir. 2007); *see Gibson v. Clanon*, 633 F.2d 851, 854

(9th Cir. 1980) (explaining that  a jury's consideration of extrinsic material is a constitutional

violation).  There is a potential for prejudice when a juror "interjects into deliberations 'objective

extrinsic facts' regarding the accused because that juror becomes an unsworn witness who is not

subject to either confrontation or cross-examination."  *Mancuso v. Olivarez*, 292 F.3d 939, 950

(9th Cir. 2002) (citation omitted).

     No bright line exists for determining whether a petitioner has suffered prejudice from

juror misconduct; therefore, reviewing courts "place great weight on the nature of the extraneous

information that has been introduced into deliberations."  *Id*. (citation omitted).  "The inquiry

into a jury's consideration of extrinsic evidence does not end at whether misconduct occurred;

upon a finding of misconduct, a *rebuttable* presumption of prejudice applies."  *Tong Xiong v.

Felker*, 681 F.3d 1067, 1077 (9th Cir. 2012).  In the case of an allegation of juror misconduct, "a

post-trial hearing is adequate to discover whether [the defendant] was prejudiced" by that alleged

misconduct.  *Rushen v. Spain,* 464 U.S. 114, 119 at n.3 (1983); *see also Smith*, 455 U.S. at 218

(upholding post-trial hearing as an adequate remedy to determine prejudicial effect of juror

misconduct).  However, such a hearing is not constitutionally required unless a sufficiently

strong showing of misconduct has been made.  *See generally Tanner v. United States,* 483 U.S.

107, 126 (1987).  This standard recognizes that a criminal defendant's Sixth Amendment

interests are already adequately protected by several aspects of the trial process, including voir

dire, observation during trial by the court, counsel, and courtroom personnel, and observation by fellow jurors.  *Id.* at 127.

Thus, clearly established Supreme Court precedent does "not stand for the proposition that *any time* evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias."  *Sims v. Rowland,* 414 F.3d 1148, 1155 (9th Cir. 2005).  Rather, Supreme Court precedent "provide[s] a 'flexible rule.'"  *Id.*  The Ninth Circuit held that this "elasticity" is reflected in its own cases interpreting the Due Process Clause, which uniformly hold that:

> a federal court is not required to hold a hearing in order to comply with due process, but should "consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source" when determining whether a hearing is required.

*Id.* (citation omitted).

Accordingly, due process "forbids a trial judge from remaining idle in the face of evidence" indicating probable juror bias or misconduct, but there is no bright-line rule requiring a full-fledged hearing in every case.  *Id*. at 1156.

Consistent with this "flexible rule," the Court of Appeal reasonably concluded that the trial court did not abuse its discretion in denying without a hearing Hill's motion for a new trial based on juror misconduct.  The only evidence of any alleged jury misconduct was the fact that there were several young black individuals, who appeared to be friends of Hill's, in the courtroom and on the elevator with a juror, and some of the individuals made "[g]ibberish" comments mentioning the juror.  The episode in the elevator was brief and the juror did not complain of any real concern.  Moreover, the evidence was only hearsay from an investigator's

report, which trial counsel was unable to support with a declaration from the juror attesting to these facts.

This alleged evidence is clearly insufficient to demonstrate that there was any actual juror misconduct or that the jury was biased against Hill.  There is no constitutional requirement, and no decided case of the United States Supreme Court, requiring a trial court to conduct any investigation into juror misconduct unless sufficient evidence has been demonstrated that actual juror misconduct may exist.  Indeed, if the juror feared reprisal from Hill's friends, she would be more likely to acquit Hill rather than to convict him.  In this case, misconduct was not established before the trial court.  Accordingly, Petitioner has not shown that he was denied of "a jury capable and willing to decide the case solely on the evidence before it . . . ."  *Phillips*, 455 U.S. at 217.  Thus, habeas relief is not warranted as to this claim.

4.      *Ineffective Assistance of Plea Counsel* (Ground 7)

Hill additionally argues that he was denied the effective assistance of counsel with regards to a plea offer.  Counsel for Hill avers in the instant Petition that, "[o]n information and belief," according to Hill, trial counsel conveyed to Hill a plea offer of 21 years' imprisonment around the first day of trial.  Counsel further relates that Hill and his trial counsel were unable to discuss the offer before it lapsed.  As previously discussed, Hill included this ineffective assistance of counsel claim in his petition for writ of habeas corpus filed in the California Supreme Court, which was summarily denied.

The *Strickland* standard also applies to claims of ineffective assistance during the plea bargain process.  *See Lafler*, 132 S. Ct. at 1384 ("During plea negotiations, defendants are 'entitled to the effective assistance of competent counsel.'" (quoting *McMann v. Richardson*,

397 U.S. 759, 771 (1970)).  Specifically, "a defendant has the right to make a reasonably

informed decision whether to accept a plea offer."  *See Turner v. Calderon*, 281 F.3d 851, 880

(9th Cir. 2002) (citation omitted).  Accordingly, "as a general rule, defense counsel has the duty

to communicate formal offers from the prosecution to accept a plea on terms and conditions that

may be favorable to the accused."  *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012); *see also*

*United States v. Blaylock*, 20 F.3d 1458, 1466 (9th Cir. 1994) ("[A]n attorney's failure to

communicate the government's plea offer to his client constitutes unreasonable conduct under

prevailing professional standards.").

        In this case, Hill relies solely on his own statement in his Petition to establish the

existence of a formal plea offer as well as trial counsel's alleged failure to properly communicate

with him about it.  Hill does not cite any evidence from the trial record to establish that a 21-year

plea offer was actually conveyed to the defense.  Nor does he proffer sworn statements from the

district attorney or trial counsel regarding the existence of the alleged offer or counsel's alleged

failure to discuss it.  *See id.* at 1409 ("[T]he fact of a formal offer means that its terms and its

processing can be documented so that what took place in the negotiation process becomes more

clear if some later inquiry turns on the conduct of earlier pretrial negotiations.").  This is

particularly notable here where the record shows that trial counsel submitted a declaration in

support of Hill's habeas petition in the California Supreme Court, which supports many of Hill's

ineffective assistance of counsel claims but no where mentions the alleged plea deal.

Respondent urges the Court to deny Hill's ineffective assistance of plea counsel claim on that

ground.

In his Traverse, Hill argues that the claim should survive because he has requested an evidentiary hearing on the issue and that the deficiencies "can be addressed . . . in an evidentiary hearing, where witnesses will be under oath and subject to cross-examination."  However, Hill's bare allegations are insufficient to warrant such a proceeding.  *See Williams v. Woodford*, 384 F.3d 567, 588 (9th Cir. 2004) ("[C]onclusory allegations by counsel that are unsworn and unsupported by any proof or offer of proof do not provide an adequate basis to obtain a federal evidentiary hearing.").

In response to Respondent's contention in the answer that Hill's claim additionally fails because Hill does not show that he would have accepted the plea if counsel had thoroughly discussed it with him, Hill seeks to expand the record pursuant to Rule 7 Governing Section 2254 Cases to include an affidavit from Hill attesting to that fact.  Docket No. 55.  "[P]rior to AEDPA, expansion of the record was not controlled by the same standards governing the holding of an evidentiary hearing.  Rather, Habeas Rule 7 permitted expansion of the record with relevant materials."  *Roberts v. Warden, San Quentin State Prison*, No. 93-cv-0254, 2013 WL 416346, at *7 (E.D. Cal. Jan. 31, 2013).  However, for cases filed under AEDPA, in order for a petitioner to obtain leave to expand the record in support of a claim, he must show that he would also be entitled to an evidentiary hearing on that claim.  *See Holland v. Jackson*, 542 U.S. 649, 653 (2004); *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005).  Because Hill is not entitled to an evidentiary hearing on this claim, the Court must also deny his motion to expand the record at Docket No. 55.  Thus, Hill is not entitled to relief in any form with respect to his ineffective assistance of plea counsel claim.

5.     *Prosecutorial Misconduct* (Ground 8)

Hill further contends that the prosecutor committed misconduct by staring at trial

spectators during closing argument.  The Court of Appeal summarized the background of this

claim as follows:

> [Hill's] contention of prosecutorial misconduct is based on an alleged nonverbal
> communication and argument that he claims had no basis in the evidence.  According to a
> declaration by defense counsel in support of a new trial motion, when the prosecutor was
> arguing in closing that witness Carroll, a white woman, essentially lied when she said
> [Hill] was not the shooter, the prosecutor "paused and turned and stared at the audience
> composed primarily of African-Americans, many with dread[locks]."  "The implication
> was clear that the witness was somehow intimidated due to the gang influence."  When
> this issue was raised in a motion for new trial, the court stated it "ha[d] no recollection of
> the look that defense counsel [wa]s referring to," though the court "c[ounld]n't say with
> any certainty that at that particular moment [its] eyes were on the prosecutor."

*Hill*, 2011 WL 341124, at *10.

Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue

of whether the alleged misconduct violated due process.  *See Darden v. Wainwright*, 477 U.S.

168, 181 (1986).  To prevail on such a claim, a petitioner must show that the prosecutor's

conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due

process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Moreover, "[o]n habeas

review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief

only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'"

*Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S.

619, 637-38 (1993)).

Here, as previously discussed, the Court of Appeal rejected this claim on procedural

grounds after finding that the claim was forfeited due to trial counsel's failure to object before

the trial court.  Thus, the only reasoned decision to which this Court may defer is the trial court's

30

determination that the prosecutor's conduct did not warrant a mistrial or a new trial.  Under the

AEDPA, state-court findings of fact are given considerable deference.  *See* 28 U.S.C.

§ 2254(d)(2).  Hill has not demonstrated that the state court's findings that the prosecutor's

conduct at trial did not constitute misconduct was unreasonable in light of the evidence presented

to the state court.  "A federal court may not second-guess a state court's fact-finding process

unless, after review of the state-court record, it determines that the state court was not merely

wrong, but actually unreasonable."  *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004)

(internal citation omitted).  On federal habeas review, this Court must presume that the state

court's factual determinations are correct, and Hill bears the burden of rebutting this presumption

by clear and convincing evidence.  28 U.S.C. § 2254(e)(1) (stating that "a determination of

factual issues made by a[s]tate court shall be presumed to be correct" and observing that "the

applicant shall have the burden of rebutting the presumption of correctness by clear and

convincing evidence"); *Williams v. Rhoades*, 354 F.3d 1101, 1106 (9th Cir. 2004).  Hill does not

indicate which facts from the state court's order are incorrect, nor does he provide any citations

to the record that support another version of the facts; therefore, he fails to carry his burden of

demonstrating by clear and convincing evidence that the state court's findings of fact are

unreasonable.

 Moreover, Hill fails to establish that, even if the alleged nonverbal communication

constituted misconduct, it had a "substantial and injurious effect or influence on the jury's

verdict."  *Brecht*, 507 U.S. at 637.  Importantly, the trial court instructed:

> Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discussed their case, but their remarks are not evidence. Their questions are not evidence.  Only the witnesses' answers are evidence.  The attorneys' questions are significant only if they helped you understand the witnesses'

answers.  Do not assume that something is true just because one of the attorneys asked a question that suggested it was true.

The jury is presumed to follow the court's instructions.  *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) (the Supreme Court "presumes that jurors, conscious of the gravity of their task, attend closely [to] the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them").

To support his assertion that there was a reasonable probability that the outcome of Hill's trial would have been different absent the challenged conduct, Hill points only to his disbelief that the jury would discredit the testimony of a defense witness who was "an uninvolved party, who was not a member of any gang, who had made no prior inconsistent statements, and who said that *Hill was not the shooter*."  But this Court is in no position to question the jury's credibility judgment.  *See Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("the assessment of the credibility of witnesses is generally beyond the scope of review"); *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004).  Without more, this claim is too speculative to warrant relief.  *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (granting habeas relief "on the basis of little more than speculation with slight support" is improper).  And for the same reasons, Hill has not shown that he is entitled to an evidentiary hearing on this claim either.  Accordingly, Hill is not entitled to relief on his prosecutorial misconduct claim.

6.    *Insufficiency of the Evidence* (Ground 9)

Finally, Hill alleges that there was insufficient evidence to support his conviction.

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction.  *Schlup*, 513 U.S. at 330. The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam).  *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  *Id.* at 3-4.  Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"  *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

In support of his claim, Hill argues that certain testimony presented at trial creates too much doubt to sustain his conviction, and there was insufficient evidence linking him to the crime, which was largely based on "extrajudicial" and inconsistent statements made by witnesses.  But these arguments simply point out inconsistencies in the evidence before the jury and attack the credibility of the witnesses.  This Court is precluded, however, from either re-weighing the evidence or assessing the credibility of witnesses.  *Schlup*, 513 U.S at 330; *Bruce*, 376 F.3d at 957-58.  All of the evidence and testimony he identifies in support of his claim was before the jury for its assessment.  Although it might have been possible to draw a different inference from the totality of the evidence, this Court is required to resolve that conflict in favor

34

of the prosecution.  *See Jackson*, 443 U.S. at 326.  The Court of Appeal found the following in

rejecting Hill's sufficiency of the evidence claim on direct appeal:

> There was evidence that [Hill] had motive to kill members of BAY. Defendant had "been trying to get all [Chris's] partners from [BAY]."  Lawrence was one of those partners.  Three weeks before Lawrence was shot, [Hill] approached Donald, a BAY member, at a Chevron station and said that [Hill] had heard that Donald and his partner "Poppa" were the ones who had shot him ([Hill]) in an earlier incident.  [Hill] pulled out a gun and started shooting in the air.  From this evidence, a reasonable jury could have found that [Hill] had a motive to shoot BAY members.
>
> There was the evidence [Hill] planned the murder.  [Hill] was seen in a slow-moving car in the area of Mack Road, driving past the donut shop, and making multiple U-turns.  Chris, who was sometimes mistaken for his brother Donald, was near the donut shop talking with Lawrence.  From this evidence, a reasonable jury could have found that [Hill] was looking for and preparing to shoot BAY members.
>
> There was evidence it was [Hill] who shot Lawrence.  Chris saw the shooter's profile.  In his interview with MacLafferty, Chris identified [Hill] as the shooter.  [Hill] makes much of the fact that at trial Chris denied that [Hill] was the shooter.  However, as even the case cited by [Hill] explained, "[l]ike the United States Supreme Court, we reject the proposition that 'out-of-court statements of identification are inherently less reliable . . . .'"  (*People v. Cuevas* (1995) 12 Cal.4th 252, 265–266, quoting *United States v. Owens* (1988) 484 U.S. 554, 561 [98 L.Ed.2d 951, 959].)
>
> There was evidence [Hill] admitted his conduct.  [Hill]'s girlfriend Lashawna Dees told Detective MacLafferty that [Hill] told her "'something bad happened in Sacramento' " and he was going to Atlanta.  Dees told her best friend, Stashaun Lewis, that [Hill] wanted to hide out at Dees's house and then leave town because he had shot someone.
>
> Finally, there was evidence that supported [Hill]'s imminent flight.  When defendant was arrested, he had another man's identification card.  And, in [Hill]'s bedroom, there were three bags containing shoes and clothes stacked next to the bedroom door "like they were getting ready for someone to leave."
>
> This evidence was sufficient to establish it was [Hill] who shot Lawrence dead.

*Hill*, 2011 WL 341124, at *10-11.

Viewing that evidence in the light most favorable to the verdict, the record does not

compel the conclusion that no rational trier of fact could have found proof of Hill's guilt.  Thus,

considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA, this Court concludes

that there was sufficient evidence introduced at trial from which a rational trier of fact could

have found beyond a reasonable doubt that Hill was guilty of the first degree murder of Lawrence.  Hill is thus not entitled to relief on this claim.

## V. CONCLUSION AND ORDER

Hill is not entitled to relief on any ground raised in his Petition, and it is unnecessary to expand the record or hold an evidentiary hearing as to any of his claims.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** Hill's request for an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED THAT** Hill's motion to expand the record at Docket No. 55 is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: December 3, 2015.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge